# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL MULLEN,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 16-4154** |
| | : | |
| **PLANET FITNESS, INC.,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, C. J.**                                                        **March 22, 2018**

Michael Mullen brings this suit against Planet Fitness, Inc., his former employer, alleging employment discrimination[1] based on retaliation.  Planet Fitness filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, to which Mr. Mullen responded.  For the following reasons, I will grant the motion in its entirety.

## I.  BACKGROUND

For three years, Mr. Mullen worked in various capacities at independent Planet Fitness franchises in Pennsylvania.  In late 2011, Mr. Mullen became an employee of Planet Fitness upon the defendant's acquisition of the Pittston, Pennsylvania facility.  In October 2012, Mr. Mullen was promoted to regional manager of the defendant's Long

---

[1] Mr. Mullen brings his employment discrimination claims under Title VII of the Civil Rights Act of 1964, and under the Pennsylvania Human Relations Act.  While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts.  Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995).  Accordingly, I shall specifically address only the Title VII claims which analysis applies equally to the PHRA claim.  Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

Island Region.  In February 2014, he laterally transferred to the Pennsylvania East Region where he remained until his termination on August 20, 2015.

As a regional manager, Mr. Mullen's responsibilities included: (i) performing monthly club facility inspections; (ii) hiring, training, promoting, and disciplining managers and assistant managers; and (iii) engaging in quality assurance checks on his region's locations through "info calls" and tours.  He was also responsible for visiting each of his clubs several times per month when he would evaluate the staff and the cleanliness of the club.

Regional managers were also required to complete a manager payout inspection[2] for each club within his/her region on a monthly basis.  Between January 2015 and August 2015, Mr. Mullen was responsible for eight Planet Fitness facilities and, therefore, was required to perform eight inspections per month.  The purpose of a Corporate Inspection Review was to evaluate, among other things, the particular club's cleanliness and maintenance; to ensure that the club was operating at "high standards;" and to ensure customer satisfaction.  The Corporate Inspection Review was also used to evaluate the performance of the regional managers, and the performance of the general manager and staff.

---

[2] Mr. Mullen testified that a manager payout inspection differed from other club visits in that a manager payout inspection would result in a financial bonus for staff whose facility earned positive marks in the inspection.

On June 18, 2015, Mr. Mullen became aware of a consensual sexual relationship between Cody Michaels, a corporate operations specialist,[3] and Laura Irwin, a front-desk associate at the Downingtown facility. Sometime during this relationship between May 2015 and June 2015, Mr. Michaels sent a picture of his genitalia to Ms. Irwin *via* Snapchat.[4] Ms. Irwin saved the picture on her cell phone and showed it to Abbey Jones, her roommate who also worked at the Downingtown facility. Ms. Jones informed Dominic Massino, the general manager of the Downingtown location, of the relationship and the photograph. On June 18, 2015, Mr. Massino sent Mr. Mullen a text message which stated: "Btw [Mr. Michaels] sent Laura a dick pic on snapchat yesterday, just so you know haha." That same day, Mr. Mullen emailed Justin Alleman, Senior Regional Manager and Mr. Mullen's direct supervisor, stating:

> "Downingtown weekend front desk staff (Laura) told
> Dom that she is currently in relations or being intimate
> with Cody, our Operations Specialist. When I asked him

---

[3] Corporate operations specialists are remote employees who can be deployed throughout the company's territory for various reasons, including: visiting a region and/or specific club in order to assist with performance or operational issues or to diagnose problems; evaluating cleanliness; opening new corporate locations, including assisting with pre-opening sales, hiring managers, and training staff members; assisting regional managers; and filling in for regional managers who are on vacation. Corporate operations specialists are not responsible for a specific set of clubs, but may be deployed by a senior regional manager to any region or club. Like regional managers, corporate operations specialists may also complete a Corporate Inspection Review and may evaluate a club's operations, cleanliness, and staff. As such, a sexual relationship between a corporate operations specialist and a staff member could very well be seen as problematic. In fact, a corporate operations specialist's fraternization with an employee is prohibited by the defendant's employee handbook.

[4] I note that, at his deposition, Mr. Michaels indicated that Ms. Irwin had initiated the picture sharing by sending nude photographs of herself to Mr. Michaels first also *via* Snapchat. At her deposition, Ms. Irwin confirmed that she had sent approximately ten pictures of her naked and/or partially-clothed body and genitalia to Mr. Michaels *via* Snapchat during the period of their relationship.

how long, I was told at least two weeks. Apparently, it all started when he came into the gym a little more than a month ago . . . It should also be noted that Laura is not very shy about telling the entire staff about her and Cody as well. I will await your instruction on how to handle this employee, if she was so comfortable to freely share this information with her GM, I'm concerned she is saying much more to employees and members."

On the following day, Mr. Mullen spoke with Alison Johnson, the defendant's Associate General Counsel, to discuss the picture that Mr. Michaels had sent to Ms. Irwin. A week later, Mr. Michaels received an Employee Feedback/Warning Notice, which set forth a "Plan for Improvement" requiring Mr. Michaels to "use better judgment when interacting with other Planet Fitness staff members" and to read the Code of Ethics and Non-Fraternization Policy. Mr. Alleman also advised Mr. Michaels that he would not be deployed to the Downingtown facility for an indeterminate amount of time. Mr. Michaels testified that he was also informed that he could no longer work out at the Downingtown facility in his private time.[5]

At his deposition, Mr. Alleman testified that the defendant determined that the relationship between Mr. Michaels and Ms. Irwin did not violate the defendant's non-fraternization policy because Mr. Michaels was not a direct supervisor of Ms. Irwin and he possessed no authority to impact Ms. Irwin's performance or career. Mr. Alleman did indicate, however, that the defendant believed that Mr. Michaels had violated the

---

[5] At his deposition, however, Mr. Alleman testified that he did not restrict Mr. Michaels from exercising at the Downingtown location during his own free time. Ms. Johnson also testified that it was her understanding that Mr. Michaels was permitted to work out at the Downingtown club on his personal time.

personal business relationship section of the defendant's code of ethics. Had the behavior

escalated, it would have likely violated the non-fraternization policy.

At her deposition, Ms. Johnson testified:

> "As far as I know, Cody and Laura were in a consensual
> relationship and I know that from Cody and from Laura.
> So there wouldn't be a reason that we would restrict
> Cody from being in the club because of Laura. It wasn't
> the kind of relationship that concerned us from an
> employment standpoint."

After a series of issues about Mr. Mullen's management of his facilities during the

summer of 2015, Mr. Mullen was terminated on August 20, 2015. Mr. Mullen believes

that his termination was really in retaliation for his continuing to raise concerns about the

possible sexual harassment of an employee at one of his facilities. He claims that, after

making these complaints to higher management, he began to be micromanaged, his

supervisor "made mountains out of molehills," and he was terminated for pretextual

reasons.

## II. STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law. FED.R.CIV.P. 56(a). A dispute is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect

the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for

informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. FED.R.CIV.P. 56(c)(1)(A). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

In his amended complaint, Mr. Mullen claims that the defendant terminated his employment in retaliation for reporting to management an inappropriate sexual relationship between a corporate operations specialist and a female employee at the defendant's Downingtown location, for reporting that other female employees were uncomfortable working around that corporate operations specialist, and for threatening to take legal action against the defendant based on alleged retaliation.

Title VII prohibits employers from retaliating against employees for complaining about discrimination and harassment in the work place. 42 U.S.C. § 2000e-3(a). The PHRA also prohibits an employer from discriminating against employees who oppose discrimination or file charges of discrimination. 43 PA. CONS. STAT. § 955(d). The elements of a retaliation claim are the same under both statutes. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).

Where, as here, there is no direct evidence of retaliation, claims alleging retaliation under Title VII are analyzed under the McDonnell Douglas burden-shifting framework. Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006). Under this framework, a plaintiff must first establish a *prima facie* case of retaliation under Title VII, by showing that: (1) he engaged in protected activity;[6] (2) the employer took an

---

[6] Protected activity may take the form of either "participation" or "opposition." Washco v. Fed. Express Corp., 402 F.Supp.2d 547, 554 (E.D. Pa. 2005). Title VII's opposition clause makes it unlawful "for an employer to discriminate against any of his employees or applicants . . . because he has opposed any practice made an unlawful employment practice by" Title VII, 42 U.S.C. § 2000e-3. The participation clause forbids employers from discriminating against any employee

adverse employment action[7] against him; and (3) there was a causal connection between

his participation in the protected activity and the adverse employment action.[8]  Id. at 340-

341.  If the plaintiff establishes a *prima facie* case of retaliation, then the burden shifts to

the employer to provide a legitimate, non-retaliatory reason for its conduct.  Id. at 342.  If

it does so, the burden then shifts back to the plaintiff "to convince the factfinder both that

the employer's proffered explanation was false, and that retaliation was the real reason

for the adverse employment action."  Id.; see also Marra v. Phila. Hous. Auth., 497 F.3d

286, 300 (3d Cir. 2007).  Thus, the plaintiff must ultimately prove that his employer's

retaliatory animus was the cause or, put differently, the "real reason," for the adverse

employment action.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir.

---

or applicant "because he has made a charge, testified, assisted, or participated in any manner in
an investigation, proceeding, or hearing" under Title VII.  Id.

[7] Retaliation claims—unlike other Title VII claims—do not limit adverse employment actions to
those that "affect the terms and conditions of employment."  Moore, 461 F.3d at 341.  What is
required is a showing that a reasonable employee would have found the retaliatory actions
"materially adverse," which means that they "well might have dissuaded a reasonable worker
from making or supporting a charge of discrimination."  Id. (quoting Burlington N. & Santa Fe
Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

[8]  In order to establish a causal connection between engagement in protected activity and an
adverse employment action, a plaintiff must demonstrate either (1) a temporal proximity between
the two events that is "unusually suggestive" of retaliation; or (2) timing plus other evidence,
such as evidence that the employer engaged in a "pattern of antagonism" with the plaintiff.
Williams v. Phila. Hous. Auth. Police Dep't., 380 F.3d 751, 760 (3d Cir. 2004); see also
Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993) (finding that even
absent temporal proximity, an employee showed a causal connection where he was subjected to a
barrage of written and verbal warnings, inaccurate point totalings, and disciplinary action);
Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007) (In certain narrow circumstances,
an unusually suggestive proximity in time between the protected activity and the adverse action
may be sufficient, on its own, to establish the requisite causal connection); Jensen v. Potter, 435
F.3d 444, 449 n.2 (3d Cir. 2006) (A court must consider whether "a reasonable jury could link
the employer's conduct to the retaliatory animus."  In assessing this, a court may consider the
"temporal proximity" between the plaintiff's protected activity and the employer's allegedly
retaliatory response, and the "existence of a pattern of antagonism in the intervening period.")

2000) (using the term "real reason" to describe the plaintiff's ultimate burden at the pretext stage).

For our purposes here, Mr. Mullen has established a *prima facie* case for employment discrimination based on retaliation. Mr. Mullen has satisfied the first element by showing that he engaged in protected activity by bringing concerns to his supervisor of what he judged to be an inappropriate sexual relationship between a corporate operations specialist and a front-desk employee at one of Mr. Mullen's facilities. Further, Ms. Johnson testified that Mr. Mullen had complained to her that the defendant was retaliating against him. Mr. Alleman confirmed that thirty days or less before his termination, Mr. Mullen advised him that he was contemplating legal action against the defendant for the retaliatory actions the defendant was taking against him. Finally, Mr. Mullen testified that he also brought concerns to management that other female staff members were feeling uncomfortable working around Mr. Michaels given the explicit nature of the picture that he had sent to Ms. Irwin.

Mr. Mullen has also satisfied the second element. On August 20, 2015, just two days after his final complaint to his supervisor about that inappropriate relationship and the perceived retaliation, Mr. Mullen was terminated from his employment with the defendant.

Though not as certain, Mr. Mullen has satisfied the causation component of the *prima facie* case by producing evidence that "could support the inference . . . of a causal connection" between the protected activity and the adverse employment action. Farrell, 206 F.3d at 279; Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997)

(explaining that "the proffered evidence, looked at as a whole, [must] suffice to raise the inference" of causation). Since June 18, 2015, Mr. Mullen complained to management about the potential sexual harassment of one of his employees, and about his concerns of a potential hostile work environment experienced by other female staff members working with Mr. Michaels. He also threatened to take legal action against the defendant alleging retaliation. Mr. Mullen testified that his last complaint was on August 18, 2015, the day before Mr. Alleman traveled to Mr. Mullen's region for the first time, and two days before Mr. Mullen was terminated. A span this short is suggestive of retaliation at the *prima facie* stage. Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two days is unusually suggestive); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759-760 (3d Cir. 2004) (two months not unusually suggestive). Further, Mr. Alleman testified that, thirty days before the termination, Mr. Mullen informed Mr. Alleman that he was contemplating legal action against the defendant for the retaliation he was experiencing. A jury could infer that Mr. Alleman was traveling to Mr. Mullen's region to search for any problem he could find, not because he had legitimate concerns about Mr. Mullen's performance, but because Mr. Mullen had complained of sexual harassment and threatened legal action based on retaliation.

Now that Mr. Mullen has successfully established a *prima facie* case, the burden shifts to Planet Fitness who must "articulate a legitimate, non-discriminatory reason for its employment decision." At this stage, the employer's burden is "relatively light." Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir. 1994). As explained by the United States Supreme Court, the burden here is one of production rather than persuasion, thus

involving no credibility assessment.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530

U.S. 133, 142 (2000).  "The employer need not prove that the tendered reason '*actually*'

motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden

of proving intentional discrimination always rests with the plaintiff."  <u>Fuentes</u>, 32 F.3d at

763.  Provided the employer articulates a legitimate non-discriminatory reason, the

presumption of discrimination is eliminated.  <u>McNeil v. Greyhound Lines</u>, 69 F.Supp.3d

513, 522 (E.D. Pa. 2014).

Here, Planet Fitness has proffered a legitimate, non-retaliatory reason for the

action taken against Mr. Mullen, namely, his poor performance.  It is important to note

that the poor performance began to be documented before Mr. Mullen learned of the

allegedly inappropriate relationship between the two employees.  In fact, throughout the

summer of 2015, the issue of Mr. Mullen's admitted poor performance was continually

documented.

At his deposition, Mr. Alleman testified that the defendant decided to do an audit

around June 2015 of the inspection reports submitted by the regional managers.  Some

inconsistencies were found with the submissions.  After some investigation, it was

determined that Mr. Mullen was the only regional manager whose reports could not be

balanced.  The other regional managers who had discrepancies were able to supply hard

copies of the reports which eventually validated the bonus amounts awarded the staff.

Mr. Alleman testified that Mr. Mullen was the only regional manager who was not able

to provide an electronic copy or a paper copy that he had performed any inspections up

until June 2015.

Josh McCain, a corporate operations specialist, was sent by Mr. Alleman, his supervisor, to Mr. Mullen's region to investigate abnormally low "Happy-Or-Not" scores and to determine a corrective course of action. On June 1, 2015, Mr. McCain inspected the Kingston club, a facility within Mr. Mullen's region. During the inspection, Mr. McCain observed, among other things, various maintenance issues, completely empty water coolers, minimal retail stock, and that the "overall cleanliness of the club at the time was not up to company standard." On June 2, 2015, Mr. McCain completed an "Operations Specialist Club Inspection" of the Kingston club. In his report, Mr. McCain noted that:

> "Overall cleanliness was pretty disappointing. There was a lot of heavy dust build up throughout the facility prior to the iPad inspection. Most equipment had looked as if it had not been touched in 2-3 days. The front entrance had outdated POT marketing. The front desk looked awful, clutter everywhere including the gym floor, lots of damage in the floor and warn underneath machines. Cardio equipment was dust free, however not clean. It appears that equipment is being dusted just not PF clean. Strength equipment was ok, however inside the machines were coated with dust. Free weight areas had weights scattered and had dust accumulation everywhere."

When asked whether he found the condition of the Kingston club acceptable on that date, Mr. Mullen testified that he would have liked to have seen the Kingston club "better."

On June 2, 2015, Mr. McCain also completed a Corporate Inspection Review of the Kingston club. Mr. Mullen testified that he did not disagree with any of the information or photographs set forth in the "Corporate Inspection Review." Although the club manager was responsible for the day-to-day operations of the club, Mr. Mullen knew

that he was ultimately responsible for the appearance of the Kingston club.  I note that Mr. Mullen also testified that he does not believe that the inspections of the Kingston club completed by Mr. McCain on June 2, 2015 were retaliatory.

On June 3, 2015, Mr. Mullen received an Employee Feedback/Warning Notice from Mr. Alleman based on the evaluations of the Kingston club completed by Mr. McCain.  This notice stated:

> "Upon further review, the [Kingston] facility was found to be in a state of despair.  Basic operations have deteriorated causing a negative impact on our customers.  There were several lights out on the gym floor and inside the locker room.  The drink coolers were empty.  Large holes clearly visible on the gym floor.  New construction was damaged and left unaddressed.  It was reported that this damage was over one month old.  Duct tape was used to repair a portion of the damage.  The front desk was unorganized, full of clutter, and did not represent the brand.  The retail display was left empty.  These are all violations of brand standards and clear indications of a lack of management."

The notice further stated that "[Mr. Mullen] openly admitted Kingston PA was neglected and not given the proper attention and support."  Finally, the warning notice found that Mr. Mullen violated the following policies:  (1) "Mike has failed to provide the necessary support and management to Kingston PA.  Standard operating procedure dictates the Regional Manager must cover for absent [General] Managers;" (2) "There is no record of Mike performing monthly inspections as dictated by standard operation procedure.  Mike has failed to maintain copies of inspections, as well as, submit them to the online inspection platform;" and (3) "Mike has failed to maintain brand standards."

Based on this notice, Mr. Mullen was placed on a "Plan for Improvement," which provided, among other things, that Mr. Mullen would be placed on a thirty-day probation period, which was "necessary to determine Mike's effectiveness in his region," and that Mr. Mullen would be "required to spend each work day in a specific club." Mr. Mullen testified that he did not disagree with any of the information set forth in the June 3, 2015 Employee Feedback/Warning Notice, with the exception of the statement that he "indicat[ed] that he had thrown out [inspection reports for the PA East Region]." Mr. Mullen testified that he had informed Mr. Alleman that he, in fact, had hard copies of the inspection reports, but Mr. Alleman told Mr. Mullen not to worry about it.

At his deposition, Mr. Alleman testified that this was the first discipline he ever issued to Mr. Mullen, and that he was very surprised to learn of Mr. Mullen's performance problems starting in June 2015. Mr. Mullen testified that he did not complain to anyone regarding the June 3, 2015 Employee Feedback/Warning Notice, that he does not believe that it was retaliatory, and that he does not believe that it was based on anything other than the June 2, 2015 evaluations of the Kingston club completed by Mr. McCain.

On June 2, 2015, Elizabeth Jenkins, Director of Corporate Operations, and Mr. Alleman's supervisor, forwarded the "Corporate Inspection Review" to Mr. Mullen and wrote: "Mike, we spend a million dollars on this club and we have EMPTY coolers to make it look like we are going out of business? What is going on?" After receiving this email, Mr. Mullen called her. He testified that he told her, "Elizabeth, I'm sorry that you're not happy with the club. You know I'll make it better. I'll take care of it." Ms.

Jenkins responded to him using profanity. Mr. Mullen testified that she responded, "Don't you f**king open your f**king eyes when you walk through these f**king clubs? I should f**king take your paycheck away."

Concerned by the disrespectful treatment, Mr. Mullen discussed this conversation with Mr. Alleman and Alison Johnson, the defendant's Associate General Counsel. Ms. Johnson scheduled an in-person meeting with Ms. Jenkins and advised her to be more professional when speaking with her direct reports. After the June 2, 2015 phone call, Ms. Jenkins never used profanity with Mr. Mullen again, or said anything to him which he felt was unprofessional or inappropriate. In fact, in an email to Mr. Mullen dated June 12, 2015, Ms. Jenkins stated, "Heard you have been putting in 100% and that the region is looking good, keep up the good work. Glad to hear it, you scared me!" Mr. Mullen responded, "Little slip, back on track. Sorry!" Ms. Jenkins responded, "Happens to everyone! Happy Friday!" At her deposition, Ms. Jenkins testified that she initiated the contact with Mr. Mullen after receiving a report from Mr. Alleman that Mr. Mullen's region was doing better.

On June 3, 2015, Mr. McCain conducted an inspection of the Warminster facility, also in Mr. Mullen's region. During that inspection, Mr. McCain noted that staff members' food was stored in the cooler that held drinks for club members to purchase, that handmade – rather than vendor-approved – signs were being used at the club, that rate sheets had not been updated to reflect equipment changes that the club had recently made, and that there were some maintenance issues. On June 4, 2015, Mr. McCain reported to Mr. Alleman that a decal was falling off of one window and that another

window was cracked at the Scranton club.  On June 5, 2015, Mr. McCain visited the

Allentown club and reported to Mr. Alleman that "[t]he gym was in pretty rough shape."

On June 18, 2015, Mr. Mullen became aware of the consensual sexual relationship

between Mr. Michaels and Ms. Irwin, and the inappropriate picture Mr. Michaels sent to

Ms. Irwin.  In a memo to the file dated June 19, 2015, Ms. Johnson memorialized a

telephone conversation she had with Mr. Mullen about the situation.  She outlined Mr.

Mullen's concerns about Mr. Michaels' unprofessional behavior, and about the

unprofessional and derogatory manner in which Ms. Jenkins spoke to him.  Ms. Johnson

also stated that Mr. Mullen had received an email from Mr. Alleman a few days after the

telephone call with Ms. Jenkins, asking what Mr. Mullen does any day at any of the

clubs.  Finally, Ms. Johnson summarized Mr. Mullen's concerns of his possible

termination.  I note that being targeted or treated differently based on his participation in

protected activity was not expressed as a concern:

> If [Mr. Alleman's] not happy or [Mr. Mullen's]
> performance isn't to par anymore, to stop trying to build
> a case against him.  He said that if they are trying to take
> the proper steps to fire him, he wants to just know and
> move on.  He felt that they were not treating him right.
> [Mr. Alleman] assured him that it wasn't that they are
> trying to fire him, trying to move past it.  [Mr. Mullen]
> feels like he's being pushed out.  Feels like they are
> trying to build a case against him.  Feels like they are
> grilling him about things when they are pretending to just
> ask him nonchalant questions.  Other regions are getting
> a day or more to prepare for calls and he's getting only a
> few hours.  Elizabeth is peppering him to send her rate
> sheets but she's not asking any other regionals for them.
> He thinks she's just looking for a reason to get rid of him
> or give him a hard time.  They are disrupting his every
> day work.  Obvious that he's being treated differently

> than others. Everyone is dismissing what [Mr. Michaels]
> is doing. [Mr. Mullen's] feeling like he's under fire.
> [Mr. Michaels] is talking about being the next regional.
> [Mr. Mullen] feels like they are pushing him out. He's
> very concerned that [Mr. Michaels] will purposely give
> [Mr. Mullen] a bad evaluation so [Mr. Michaels] can be
> next regional.

There is evidence in the record that Mr. Mullen saw Mr. Michaels as a threat long before he had learned of his inappropriate relationship and photograph. Mr. Alleman testified that while he and Mr. Mullen were constantly communicating about Mr. Mullen's performance issues during June 2015, Mr. Mullen expressed a concern that Mr. Michaels had been working out during his free time at the Downingtown location and attempting to counsel the staff on ways of improving the facility. Mr. Mullen felt the staff members did not appreciate Mr. Michaels' input. Mr. Mullen told Mr. Alleman that he felt that Mr. Michaels was really just interested in taking over Mr. Mullen's position. It was several weeks later that Mr. Mullen told Mr. Alleman about Mr. Michaels' inappropriate picture being sent to Ms. Irwin.

At her deposition, Ms. Johnson testified that Mr. Mullen used the situation with Mr. Michaels and Ms. Irwin to deflect attention from his own performance issues:

> "Mike would never accept that we were handling the
> Cody Michaels' situation. He would never accept that
> we had looked into it. He didn't believe us that we had
> issued any kind of discipline, and he was really fixated on
> that. And no matter what I would say or Justin would say
> to him regarding anything that was going on in his
> region, it would all come back to this is all Cody's fault,
> this is because you didn't discipline him. When in
> reality, I knew what had happened, I knew that Cody had
> been disciplined. Justin and I had worked through the
> situation together, so I was aware of all the facts. Mike

wasn't aware of all of the facts, nor was he privy to all of the facts. So, it just became a little bit frustrating that he wouldn't trust that we had handled it in a way that we saw fit. And any time we would bring up his performance issues, he would blame Cody, which didn't make much sense to me."

Ms. Johnson continued:

"Mike was very sensitive about Cody being in the club. He felt that Cody was tattling on him and we kept getting these emails and complaints about it, so I think frankly, it was because it was becoming a bit of a headache and we decided for a number of reasons that it would be easier if Cody could just stay out of the Downingtown club in a professional capacity."

The documentation of Mr. Mullen's negative performance throughout his region continued. On July 10, 2015, Mr. Alleman emailed Mr. Mullen concerning the Warminster, Pottstown, Allentown, Downingtown, Kingston, and Scranton clubs. Mr. Alleman explained that Mr. McCain reported to Mr. Alleman that the Pottstown club "looked like crap;" that Warminster "blew me away;" that Downingtown and Scranton were "solid;" that Kingston was "way better;" and that the Allentown club was "just ok, still kind of dirty but not as bad as last time. Manager seems overwhelmed." Mr. Mullen did not disagree with Mr. McCain's observations of the six clubs and had no reason to believe that Mr. McCain's comments were based upon anyone else's observations of those clubs. Further, Mr. Mullen testified that he does not believe that the July 10, 2015 email from Mr. Alleman was retaliatory. In fact, when asked if he thought the email was retaliatory, Mr. Mullen responded, "No, absolutely not."

In July or August 2015, Ms. Jenkins called Mr. Mullen to ask him questions about his region. All of the questions asked by Ms. Jenkins pertained to Mr. Mullen's job duties and responsibilities. Mr. Mullen noted, however, that most regional managers are provided at least a day to prepare for such a call, but he was only given one hour to prepare. He characterizes this treatment as proof that he was being micromanaged so that the defendant could build a paper trail against him after his complaints.

On July 22, 2015, Mr. Alleman emailed Mr. Mullen, writing: "According to my inbox it's been 8 business days since your last inspection. In addition, I'm only seeing two total for the month (Pittston 7/8 and Peckville 7/7). Let's get moving on this. One, I don't want to micromanage, and two, this is a way for you to show me what you're doing on the ground. I want to see those heavy hitting inspections come through with a ton of pics. Show me the progress you made and that you are maintaining it." Mr. Mullen testified that there was nothing in this email with which he disagreed.

On August 12, 2015, Mr. Alleman conducted an "info call" to the Peckville location which was undergoing a renovation. The individual who answered the phone did not mention the renovation.[9] Mr. Alleman emailed Mr. Mullen to inform him that the renovation was not mentioned when Mr. Alleman called the Peckville club. In response, Mr. Mullen assured Mr. Alleman: "I'll follow up there and make sure [the script] is up

---

[9] It is a common practice for the defendant's management to make or to arrange to have made test calls to the defendant's facilities to be sure that the staff is providing the public with proper information about a facility. To that end, the defendant provides "info call scripts" to the staff at each facility. An info call script is a script followed by club staff to convey important information to current or prospective customers who call the club, including sales information or information concerning remodeling. Mr. Mullen, as regional manager, was responsible for ensuring that the clubs in his region were using the proper info call script.

and that is the one they are reading, we talked about the script weeks ago so I know they have it. I'll take care of it right now."

On August 18, 2015, Mr. Alleman conducted info calls of the Peckville, Pottstown, and Allentown clubs, all of which were undergoing renovations. This time, the Peckville club utilized the proper script. However, the Pottstown and Allentown clubs failed to mention the ongoing construction at those clubs. On that same day, Mr. Mullen received a written warning for "poor performance," particularly, "Mike failed to ensure his team has and is using the most current information, in this case info call materials, to ensure successful execution of company initiatives." The written warning specifically advised Mr. Mullen that "[a]ny further policy violations or instances of poor performance will result in disciplinary action and may require termination." Mr. Mullen refused to sign the warning.

Also on August 18, 2015, Mr. McCain visited the Pottstown club, where a new general manager had begun her employment on July 28, 2015. Mr. McCain advised Mr. Alleman in an email that the club was "in need of a serious detailing" and "still has a ways to go." He attached pictures of various maintenance issues. Mr. McCain further stated, however, that the club "is going in the right direction as this was definitely the best that I have seen the club."

Based on Mr. McCain's report, Mr. Alleman conducted an unannounced visit to the Pottstown club on August 19, 2015. This was the first time he had ever visited Mr. Mullen's region during the time Mr. Mullen was a regional manager. Mr. Alleman testified that he made the decision to terminate Mr. Mullen after he visited the Pottstown

location.[10]  On an Employee Termination Form dated August 20, 2015, Mr. Alleman

noted that he had found the Pottstown club to be:

> "extremely dirty and in disrepair.  Upon entering the
> facility, there was an abundance of candy wrappers,
> cigarette butts, and debris spread across the store front.
> The once yellow speckled gym floor is now completely
> black.  I found buildup of dust on cardio equipment,
> strength equipment, supporting beams, emergency lights,
> walls, and lockers.  The top of the showers have obvious
> mold infestations.  The emergency exit door was covered
> in rust.  Sills were cracked and destroyed to [the] point
> you could see into the interior structure."

Mr. Alleman also wrote that he had interviewed the recently hired manager of the

Pottstown club.  Regional managers are required to spend a minimum of the first three

days with every newly hired general manager in order to ensure that the manager "has the

tools to be successful and performance is optimal."  The new manager informed Mr.

Alleman that she received "one day of training on her first day . . . and has yet to receive

a follow up visit."  Mr. Mullen testified that he does not disagree with any of the

information set forth in the Employee Termination Form.

    At his deposition, Mr. Alleman testified that he determined to terminate Mr.

Mullen's employment based on his poor performance with regards to facility

maintenance or facility standards and cleanliness.  He stated that:

> [Mr. Mullen's] facilities were outside of standard, and
> they were having issues with cleanliness.  It started in the
> Kingston facility.  [Mr. Mullen] was given a cure period

---

[10] This testimony is contradicted by the testimony of Ms. Jenkins, who stated that before Mr.
Alleman left for the visit to Pottstown, he informed her that he was traveling there to terminate
Mr. Mullen's employment.  Given the amount of evidence to support termination, I find that this
contradiction is of no import.

> to implement any systematic changes to how he chose to clean and maintain his facility. He was given an opportunity to provide his own team with coaching and direction and facilitate results. When I visited the Pottstown location, it was very clear that that was not being done, and that was when I decided to escalate the situation to termination.

The record also contains evidence that Mr. Mullen's difficulties as regional manager had been ongoing and preceded his complaints to management about the relationship between Mr. Michaels and Ms. Irwin. Mr. Alleman testified that Mr. Mullen lacked initiative during the time he was a regional manager. On his 2014 performance evaluation as a regional manager, Mr. Mullen received an "at-standard" rating. Mr. Alleman indicated that Mr. Mullen did well in some areas, and poorly in others. There were several goals as part of that review that Mr. Mullen accepted, but he admittedly did not put forth any effort into completing them within the year provided. Further, Mr. Alleman said, Mr. Mullen never brought the potential failure of meeting his goals to Mr. Alleman's attention. Mr. Alleman remembers giving no disciplines to Mr. Mullen during 2014, but he does remember giving him two disciplines in 2015. Mr. Alleman believes that he documented all of Mr. Mullen's performance issues in the June 2015 timeframe, such as the conditions of his facilities and the defendant's inability to submit bonuses to staff because of Mr. Mullen's failure to submit the required reports.

Mr. Alleman testified that he and Mr. Mullen had several conversations regarding Mr. Mullen's performance and his lack of engagement after the first write-up, and the continuing cleanliness issues with his facilities. Mr. Mullen notified Mr. Alleman that he really could not get over his experiences with Ms. Jenkins and Mr. Michaels, and he just

wanted to give up. Those indications became a "huge concern" for Mr. Alleman who attempted to provide motivation to Mr. Mullen to build him up and return him to a place where he could feel successful again. Mr. Alleman further testified, however, that Mr. Mullen never indicated to him that the disciplinary actions during the summer of 2015 were a result of Mr. Mullen's complaining about Mr. Michaels' inappropriate behavior.

When asked if Mr. Mullen ever informed Mr. Alleman that he was contemplating legal action against the defendant, Mr. Alleman responded that Mr. Mullen had mentioned that as an option. Mr. Alleman testified that he was not concerned about those threats.[11] He indicated that he was confident in the steps he had taken with Mr. Mullen to coach him and to try to motivate him and push him through these performance difficulties. Mr. Mullen made his decision to not improve and his performance was just a reflection of that decision. In fact, on August 20, 2015, when Mr. Alleman came to Mr. Mullen's location to terminate him, Mr. Mullen apologized for his performance. He said,

> "you know, I kinda knew this was coming. I'd like to tell you more about it, but I've been, you know, told not to say anything for legal reasons. But, you know when this all blows over, you know, I'll be back in touch."

Mr. Mullen accepted the termination, and then Mr. Alleman and Mr. Mullen went to eat breakfast at Mr. Mullen's invitation. Mr. Alleman testified that the first time that he had seriously considered terminating Mr. Mullen was when he arrived at the Pottstown facility. At that point, it became clear to Mr. Alleman that Mr. Mullen had no interest in

---

[11] Mr. Alleman indicated that Mr. Mullen had threatened legal action once in person, and once on a telephone call.

correcting some of the behaviors that Mr. Alleman had pointed out, and that Mr. Mullen was driving the situation and the outcome.

The basic framework under Title VII provides that, to defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with a legitimate, non-discriminatory reason for its action, the plaintiff must come forth with "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. In order to raise disbelief under the first method of proof, the evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" sufficient to show that the employer's reason for termination was non-discriminatory. Willis v. UPMC Children's Hosp., 808 F.3d 638, 644–45 (3d Cir. 2015). Under the second method, Mr. Mullen may elect to point to evidence leading a factfinder to reasonably believe that a discriminatory reason was more likely than not a motivating or determinative factor in his termination. Id. at 645.

Mr. Mullen has not produced any evidence that suggests that the defendant's action was pretextual and not merely based on the well-documented and self-admitted performance deficiencies, which resulted in a thirty-day probationary period during June 2015, and two written warnings issued that summer. The defendant's neutral reason for disciplining and ultimately terminating Mr. Mullen is facially valid. Mr. Mullen admitted

24

to the issues that gave rise to the performance deficiencies.  In fact, Mr. Mullen testified that he believed that Mr. Alleman did not retaliate against him.

First, in attempting to discredit Planet Fitness's proffered reason for termination, Mr. Mullen argues that the record is completely devoid of any discipline or other performance issues before the written warning he received on June 3, 2015, just days before he began to complain of the inappropriate relationship.  He argues that a jury would "be entitled to rely on this lack of evidence to cast doubt on the defendant's theory that such a long-tenured employee, who worked his way up from instructor all the way to regional manager, could suddenly and drastically decline to the degree that the defendant has suggested."  In fact, Mr. Mullen argues that the June 3 warning cannot support his termination because all the concerns raised in that written warning "were promptly and properly addressed and corrected following" his receipt of the warning.

This argument is irrelevant.  Whether the concerns were corrected or not, the warning shows that Mr. Mullen's performance was an issue which resulted in his first discipline, and that the discipline occurred before he raised any concerns about Mr. Michaels' and Ms. Irwin's relationship.  For example, there is uncontroverted evidence that Mr. Mullen was the only regional manager whose reports could not be balanced and whose bonus amounts awarded the staff could not be validated.  Further, Mr. Mullen's region was reported to have abnormally low "Happy-Or-Not" scores which prompted Mr. McCain's first inspection on June 1, 2015.

Mr. Mullen also disputes the validity of the August 18, 2015 discipline he received from Mr. Alleman.  Mr. Mullen testified that failing info calls was a common issue that

happened in the past and he was never issued any kind of write-up or discipline before his complaints began. Moreover, he notes that the club that originally failed the info call on August 12, 2015, passed the info call on August 18, 2015. Mr. Mullen argues that passing the call on August 18 must prove that he properly addressed the alleged concerns of Mr. Alleman. This argument is also meritless because it fails to include the fact that three info calls were conducted on August 18, 2015, and two of the three facilities failed. The warning was warranted because two of the three facilities failed the call about a week after he was counseled about providing the proper scripts to his facilities.

Next, Mr. Mullen argues that Mr. Alleman's "story" that he "spontaneously" decided to visit Mr. Mullen's region and found that his clubs were not up to standards is fundamentally flawed. He insists that Mr. Alleman's testimony was contradicted by Ms. Jenkins who testified that Mr. Alleman informed her before he left for Mr. Mullen's region that he was traveling to Pottstown to terminate Mr. Mullen.

This argument must also fail. First, Mr. Alleman's trip to Pottstown was prompted by Mr. McCain's negative report that the club was in need of a serious detailing. Second, there is more than enough uncontested evidence in the record to outweigh any contradicted testimony about exactly when Mr. Alleman decided to terminate Mr. Mullen based on his poor performance.

During his deposition, Mr. Mullen did not dispute the underlying conduct which led to the two warning notices he received during the summer of 2015. He testified that Mr. Alleman, the manager who made the decision to terminate him, did not retaliate against him. The record shows problems with facilities throughout his region beginning

26

before June 2015 and continuing up to his termination.  Mr. Mullen agreed that he was responsible for these problems.

Further, Planet Fitness issued a warning notice to Mr. Michaels following the discovery of the inappropriate photograph he sent to Ms. Irwin.  In fact, there is uncontroverted testimony that Planet Fitness was not concerned about the consensual relationship between Mr. Michaels and Ms. Irwin from an employment standpoint.

In conclusion, Mr. Mullen has not demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Planet Fitness's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reason.  <u>Fuentes</u>, 32 F.3d at 765.  Accordingly, I will grant the defendant's summary judgment motion in its entirety.

An appropriate Order follows.